# UNITED STATES *v.* SANTANA ET AL.

No. 75–19.   Argued April 27, 1976—Decided June 24, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 43. STEVENS, J., filed a concurring opinion, in which STEWART, J., joined, *post*, p. 44. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 45.

*Frank H. Easterbrook* argued the cause for the United States *pro hac vice*. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh, Deputy Solicitor General Frey,* and *Peter M. Shannon, Jr.*

*Dennis H. Eisman* argued the cause for respondent Santana. With him on the brief was *Gerald A. Stein.** 

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

I

On August 16, 1974, Michael Gilletti, an undercover officer with the Philadelphia Narcotics Squad arranged a heroin "buy" with one Patricia McCafferty (from whom he had purchased narcotics before). McCafferty told him it would cost $115 "and we will go down to Mom Santana's for the dope."

Gilletti notified his superiors of the impending transaction, recorded the serial numbers of $110 (*sic*) in marked bills, and went to meet McCafferty at a prearranged location. She got in his car and directed him to drive to 2311 North Fifth Street, which, as she had

---

**Frank Carrington, Wayne W. Schmidt, Vernon S. Gill,* and *William K. Lambie* filed a brief for the Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

previously informed him, was respondent Santana's residence.

McCafferty took the money and went inside the house, stopping briefly to speak to respondent Alejandro who was sitting on the front steps. She came out shortly afterwards and got into the car. Gilletti asked for the heroin; she thereupon extracted from her bra several glassine envelopes containing a brownish-white powder and gave them to him.

Gilletti then stopped the car, displayed his badge, and placed McCafferty under arrest. He told her that the police were going back to 2311 North Fifth Street and that he wanted to know where the money was. She said, "Mom has the money." At this point Sergeant Pruitt and other officers came up to the car. Gilletti showed them the envelope and said "Mom Santana has the money." Gilletti then took McCafferty to the police station.

Pruitt and the others then drove approximately two blocks back to 2311 North Fifth Street. They saw Santana standing in the doorway of the house [1] with a brown paper bag in her hand. They pulled up to within 15 feet of Santana and got out of their van, shouting "police," and displaying their identification. As the officers approached, Santana retreated into the vestibule of her house.

The officers followed through the open door, catching her in the vestibule. As she tried to pull away, the bag tilted and "two bundles of glazed paper packets with a white powder" fell to the floor. Respondent

---

[1] An Officer Strohm testified that he recognized Santana, whom he had seen before. He also indicated that she was standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence.

Alejandro tried to make off with the dropped envelopes but was forcibly restrained. When Santana was told to empty her pockets she produced $135, $70 of which could be identified as Gilletti's marked money. The white powder in the bag was later determined to be heroin.

An indictment was filed in the United States District Court for the Eastern District of Pennsylvania charging McCafferty with distribution of heroin, in violation of 21 U. S. C. § 841, and respondents with possession of heroin with intent to distribute in violation of the same section. McCafferty pleaded guilty. Santana and Alejandro moved to suppress the heroin and money found during and after their arrests.

The District Court granted respondents' motion.[2] In an oral opinion the court found that "[t]here was strong probable cause that Defendant Santana had participated in the transaction with Defendant McCafferty." However, the court continued:

> "One of the police officers . . . testified that the mission was to arrest Defendant Santana. Another police officer testified that the mission was to recover the bait money. Either one would require a warrant, one a warrant of arrest under ordinary circumstances and one a search warrant."

The court further held that Santana's "reentry from the doorway into the house" did not support allowing the police to make a warrantless entry into the house on the grounds of "hot pursuit," because it took "hot pursuit" to mean "a chase in and about public streets." The court did find, however, that the police

---

[2] It is not apparent on what grounds respondent Alejandro had standing to protest the seizures. However, the Government did not raise this issue below and consequently we do not reach it.

acted under "extreme emergency" conditions. The Court of Appeals affirmed this decision without opinion.

## II

In *United States* v. *Watson,* 423 U. S. 411 (1976), we held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment. Thus the first question we must decide is whether, when the police first sought to arrest Santana, she was in a public place.

While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz* v. *United States,* 389 U. S. 347, 351 (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester* v. *United States,* 265 U. S. 57, 59 (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson.*

The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not. In *Warden* v. *Hayden,* 387 U. S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons. This case, involving a true "hot

pursuit," [3] is clearly governed by *Warden;* the need to act quickly here is even greater than in that case while the intrusion is much less. The District Court was correct in concluding that "hot pursuit" means some sort of a chase, but it need not be an extended hue and cry "in and about [the] public streets." The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house. Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence. See *Vale* v. *Louisiana,* 399 U. S. 30, 35 (1970). Once she had been arrested the search, incident to that arrest, which produced the drugs and money was clearly justified. *United States* v. *Robinson,* 414 U. S. 218 (1973); *Chimel* v. *California,* 395 U. S. 752, 762–763 (1969).

We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson,* by the expedient of escaping to a private place. The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice White, concurring.

It is not disputed here that the officers had probable cause to arrest Santana and to believe that she was in the house. In these circumstances, a warrant was not required to enter the house to make the arrest, at least

---

[3] *Warden* was based upon the "exigencies of the situation," 387 U. S., at 298, and did not use the term "hot pursuit" or even involve a "hot pursuit" in the sense that that term would normally be understood. That phrase first appears in *Johnson* v. *United States,* 333 U. S. 10, 16 n. 7 (1948), where it was recognized that some element of a chase will usually be involved in a "hot pursuit" case.

where entry by force was not required. This has been the longstanding statutory or judicial rule in the majority of jurisdictions in the United States, see ALI, A Model Code of Pre-arraignment Procedure 306–314, 696–697 (1975), and has been deemed consistent with state constitutions, as well as the Fourth Amendment. It is also the Institute's recommended rule. *Id.*, § 120.6. I agree with the Court that the arrest here did not violate the Fourth Amendment.

My Brother MARSHALL, *post*, p. 45, and *United States v. Watson*, 423 U. S. 411, 433 (1976) (dissenting opinion), would reinterpret the Fourth Amendment to sweep aside this widely held rule and to establish a constitutional standard requiring warrants for arrests except where exigent circumstances clearly exist. The States are, of course, free to limit warrantless arrests, as is Congress; but I would not impose his suggested nationwide edict, founded as it is on a belief in the superior wisdom of the Members of this Court and their power to divine that the country's practice to this date with respect to arrests is unreasonable within the meaning of the Fourth Amendment.

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART joins, concurring.

When Officer Gilletti placed McCafferty under arrest, the police had sufficient information to obtain a warrant for the arrest of Santana in her home. It is therefore important to note that their failure to obtain a warrant at that juncture was both (a) a justifiable police decision, and (b) even if not justifiable, harmless.

The decision was justified by the significant risk that the marked money would no longer be in Santana's possession if the police waited until a warrant could be obtained. The failure to seek a warrant was harmless

because it would have been proper to keep the Santana residence under surveillance while the warrant was being sought; since she ventured into plain view, a warrantless arrest would have been justified before the warrant could have been procured.

I therefore join the opinion of the Court.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Earlier this Term, I expressed the view that, in the absence of exigent circumstances, the police may not arrest a suspect without a warrant. *United States* v. *Watson,* 423 U. S. 411, 433 (1976) (dissenting opinion). For this reason, I cannot join either the opinion of the Court or that of MR. JUSTICE WHITE, each of which disregards whether exigency justified the police decision to approach Santana's home without a warrant for the purpose of arresting her. Nor can I accept MR. JUSTICE STEVENS' approach, for while acknowledging that some notion of exigency must be asserted to justify the police conduct in this case, MR. JUSTICE STEVENS fails to consider that the exigency present in this case was produced solely by police conduct. I would remand the case to allow the District Court to determine whether that police conduct was justifiable or was solely an attempt to circumvent the warrant requirement.

The Court declines today to settle the oft-reserved question of whether and under what circumstances a police officer may enter the home of a suspect in order to make a warrantless arrest. *United States* v. *Watson,* *supra,* at 418 n. 6; *Gerstein* v. *Pugh,* 420 U. S. 103, 113 n. 13 (1975); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 480–481 (1971); *Jones* v. *United States,* 357 U. S. 493, 499–500 (1958). Seizing upon the fortuity that Santana was standing in her doorway when the police

approached her home for the purpose of entering and arresting her, the Court ignores MR. JUSTICE WHITE's repeated advocacy of the common-law rule on warrantless entries, *ante*, p. 43; *Coolidge* v. *New Hampshire, supra,* at 511–512, n. 1 (WHITE, J., concurring and dissenting),[1] and treats this case as a simple application of *Watson.*

It is somewhat more than that, for the Court takes the opportunity to refine the contours of that decision. Thus, if I correctly read the Court's citation to the "open fields" doctrine of *Hester* v. *United States,* 265 U. S. 57, 59 (1924), the Court holds that the police may enter upon private property to make warrantless arrests of persons who are in plain view and outdoors; and the Court applies that doctrine today to persons who are arguably within their homes but who are "as exposed" to the public as if they were outside. But the Court's encroachment upon the reserved question is limited.

---

[1] MR. JUSTICE WHITE would have us bequeath our duty to interpret the Constitution to the States and Congress. As I said in response to a similar argument in *Watson:*

"[T]he doctrine of deference that the Court invokes is contrary to the principles of constitutional analysis practiced since *Marbury* v. *Madison,* 1 Cranch 137 (1803). . . . [I]t is well settled that the mere existence of statutes or practice, even of long standing, is no defense to an unconstitutional practice. '[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.' *Walz* v. *Tax Comm'n,* 397 U. S. 664, 678 (1970). See also *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); *Roe* v. *Wade,* 410 U. S. 113 (1973); *Furman* v. *Georgia,* 408 U. S. 238 (1972); *Reynolds* v. *Sims,* 377 U. S. 533 (1964). Our function in constitutional cases is weightier than the Court today suggests: where reasoned analysis shows a practice to be constitutionally deficient, our obligation is to the Constitution, not the Congress." 423 U. S., at 443 (dissenting opinion) (footnote omitted).

Thus, the Court's citation of *Katz* v. *United States,* 389 U. S. 347, 351 (1967), does not suggest that a plain view of a suspect is alone sufficient to justify warrantless entry and seizure in the home. Indeed, the Court's rejection of sight alone as a basis for warrantless entry and arrest is made patent, in MR. JUSTICE STEWART's phrase, by negative implication from the Court's need to elaborate a hot pursuit justification for the police following Santana into her home. Cf. *Coolidge* v. *New Hampshire, supra,* at 480–481. Presumably, if plain view were the touchstone, Santana would have been just as liable to warrantless arrest as she retreated several feet inside her open door as she was when standing in the doorway.

The Court's doctrine, then, appears *sui generis,* useful only in arresting persons who are "as exposed to public view, speech, hearing, and touch," *ante,* at 42, as though in the unprotected outdoors. Narrow though it may be, however, the Court's approach does not depend on whether exigency justifies an arrest on private property, and thus I cannot join it.

MR. JUSTICE STEVENS focuses on what I believe to be the right question in this case—whether there were exigent circumstances—and reaches an affirmative answer because he finds a "significant risk that the marked money would no longer be in Santana's possession if the police waited until a warrant could be obtained." *Ante,* at 44. I agree that there were exigent circumstances in this case. McCafferty was arrested a block and a half down the street from Santana's home. Although the arresting officers did not see anyone in Santana's home watching the arrest, App. 16, one officer testified: "We were a block and a half from her home when the arrest was made. I am sure that the word would have been back within a matter of seconds or minutes." *Id.,* at 51. That is undoubtedly a reasonable conclusion to draw

from the facts of the arrest; and the danger that the evidence would be destroyed and the suspects gone before a warrant could be obtained would ordinarily justify the police's quick return to Santana's home and the warrantless entry and arrest. If that is the basis of the "significant risk" to which MR. JUSTICE STEVENS refers, I have no difference with him on that score.[2]

I do not believe, however, that these exigent circumstances automatically validate Santana's arrest. The exigency that justified the entry and arrest was solely a product of police conduct. Had Officer Gilletti driven McCafferty to a more remote location before arresting her, it appears that no exigency would have been created by the arrest; in such an event a warrant would have been necessary, in my view, before Santana could have been arrested. *United States* v. *Watson,* 423 U. S., at 433 (MARSHALL, J., dissenting). It is not apparent on this record why Officer Gilletti arrested McCafferty so close to Santana's home when the arresting officers were clearly aware that such a nearby arrest would necessitate the prompt arrest of Santana. App. 51. While a police decision that the time is right to arrest a suspect should properly be given great deference, cf. *Hoffa* v. *United States,* 385 U. S. 293, 310 (1966), the power to arrest is an awesome one and is subject to abuse. An arrest may permit a search of premises incident to the arrest, a search that otherwise could be carried out only upon probable cause and pursuant to a search warrant. Likewise, an arrest in circumstances such as those presented here may create exigency that may justify a search

---

[2] I assume that MR. JUSTICE STEVENS is not suggesting that exigent circumstances justifying a warrantless search or arrest are always present—regardless of whether the suspect is aware the police are on his trail—whenever police have probable cause to believe the suspect is in possession of evidence. Cf. *Vale* v. *Louisiana,* 399 U. S. 30 (1970).

or another arrest. When an arrest is so timed that it is no more than an attempt to circumvent the warrant requirement, I would hold the subsequent arrest or search unlawful. See *Coolidge* v. *New Hampshire,* 403 U. S., at 469–471; *Vale* v. *Louisiana,* 399 U. S. 30, 35 (1970); *Chimel* v. *California,* 395 U. S. 752, 767 (1969); *Abel* v. *United States,* 362 U. S. 217, 226 and 230 (1960); *United States* v. *Rabinowitz,* 339 U. S. 56, 82 (1950) (Frankfurter, J., dissenting); *United States* v. *Lefkowitz,* 285 U. S. 452, 467 (1932). Accordingly, I would remand this case for consideration of whether the police decision to arrest McCafferty a block and a half from Santana's home was for the sole purpose of creating the exigent circumstances that otherwise would justify Santana's subsequent arrest.[3]

---

[3] Because I cannot agree that police may arrest a suspect in a public place solely upon probable cause, I cannot agree with MR. JUSTICE STEVENS that any police error in deciding to return to Santana's home for the purpose of entering and arresting her was harmless.